May I please have the floor? All right, Ms. White. May it please the Court. Subject to the Court's questions, I'll be focusing my time on two issues. What are the proper tests for KBR's two defenses under the Defense Base Act and the Combatant Activities Exception? And did KBR establish those defenses as a matter of law on this record? KBR did not. For the Defense Base Act Exclusive Remedy Defense, the District Court applied the Boyle Field Safety Test. This test does not apply to this particular fact situation. We are not urging the Court to overturn this test. We do not think there's anything wrong with its reasoning. It simply doesn't answer the question for this Court. It answers the question whether an employee is an independent contractor or an employee. We know here in this case that the appellants are employees, at least of one company in the KBR family. The question is, how many other subsidiaries, parents, affiliates can pile on and claim the Exclusive Remedy Defense under the Defense Base Act? Do you claim that this case was properly removed to federal court? We do not contest the removal, Your Honor, because the question is a colorable federal defense, and there can be a colorable federal defense even when the defenses don't have merit. But we're not contesting that it's in the District Court under federal jurisdiction. All right. Because it's jurisdictional, we would have to look at that even if it's not being contested. And as I understand the case, KBR was not under the direction of any federal officer. Only its subsidiaries were under the direction of federal officers. So how can KBR, as distinguished from its other entities, remove? Your Honor, if the court agrees with us that the corporate distinctions have to be maintained, then I think that KBR has a significant problem with showing the colorable federal defense test. The problem for appellants in facing this issue is the state of the law is so unsettled, and candidly, I didn't want us taking on a burden to show that their defenses have no merit. I don't think they do, but they could still, if the court indulged this sort of thinking where all of the corporate affiliates can be collapsed together, then arguably they have a colorable defense. I don't think that under this court's precedent or any court's precedent, there's support for the idea that a parent can simply take on the business of all its subsidiaries without meeting different tests under the case law, whether those are state law workers' compensation tests, whether under federal law, so the MLRA, the ADA, there's the single employer test where companies have to show that they had common management, common ownership, that their labor relations are centrally controlled. None of that's been shown here. So what is your understanding of what KBR's role was, if any, in these operations? I'm talking about KBR itself. The record reflects that KBR Inc. had no direct role in these operations. So under Section 1442, it was not acting under any federal officer, it wasn't being directed  It was not, Your Honor. The argument that KBR Inc. used to get into federal court was that all of its subsidiaries and it should be treated as a team, i.e. one big business. And if the court agrees that there's a problem with that, then there is a problem with the assertion of a federal jurisdiction. That said, because the threshold is just colorable, we focused our arguments on, you know, if the court indulged that maybe that's a colorable argument. I don't think it's meritorious. I don't need to show... I mean, the problem is, isn't it a bit of a loop around? Because aren't you all, or explain to me why you all are not arguing, have our cake and eat it by putting KBR to the duties of an employer, but not the benefits. Because that's where the colorable defense comes from, is that they are in their role working with the subsidiaries following what the federal officers tell them, even if they weren't the signatories. So please explain that. Yes, Your Honor. And so that's where I think the fact that KBR does admit it sets policies and procedures gets them into the zone on having a colorable federal defense. The reason I don't think that the two issues collapse such that, you know, they're either an employer with a duty and they're entitled to the bar, or they're not an employer and they don't have a duty and we have no merits argument, I don't think that binary works. And the reason for that is that they can have a duty as an employer, but they can also have a duty as a third party that undertook a duty. And there are cases that support that parent companies can be liable in that situation. In this context? Yes, in parent subsidiary context. No, no. This context. They're in a place where, in Iraq, where the federal government is saying stay, and you're saying they should have gone. Your Honor, not in this particular context. I think the point of tension here is that there's actually no evidence that the federal government said stay. And that is the crux of our complaint. That's the core of the claim, is that if the federal government had said stay, then they are absolutely entitled to a defense under Boyle if this court extends Boyle to the combatant activities exception. The problem is they did nothing. And so what they are arguing is that silence is a directive from the government also. And what that means is if silence is a directive, and a directive is also a directive, KBR is asking for full immunity. Whether the government actually tells them to do something or not, because of the environment, they are entitled to immunity. And the problem is the record shows that they had discretion. So in the employment agreements, at record 2555, the employer, SEII, told the appellants at its discretion it may evacuate them from the environment. And the log cap contract itself does not say that the military is solely responsible for safety. The language that KBR quotes says that the combatant commander may, when he determines it's in the best interest of the government, determine a safety plan. And there are different elements that have to be met for when he might decide that. So the KBR entities on the ground could not override the military. But they did have discretion with how to execute their tasks. And that's clear from the log cap contract structure itself. And interestingly, even in the Saleh case, Saleh versus Titan Corps, the DC circuit said that the test they laid out would not create federal preemption in performance-based contracts where contractors were not told how to execute. So even under the test that KBR urges, the DC circuit would have recognized this case as different. So KBR had the ability, and there's nothing in the record that contests this, to decide here are some people we have to have to continue performing under the log cap contract, and here are some people that we don't need. And they could have approached the military and asked, can we do something with these non-essential people? And they've admitted that they can have that conversation. That's in the record at record site 1259 through 1261. They never did that here. And they are saying that their failure to raise anything with the military entitles them to immunity. And that's just completely counter to the basic reasoning of Boyle, which is to encourage contractor participation and to incentivize the contractor to do something. And so if KBR Inc., the parent, had not undertaken the duty to set policies and procedures for its subsidiaries, which it's interesting to me that they are arguing that KBR Inc. did that, because shareholders don't normally set policies and procedures. Management does. I think they are saying that KBR Inc. did that to try to get into federal court. They need KBR Inc. involved in the project in order to have a colorable defense. The problem is that if KBR Inc. steps out of its role as a parent, which is just supposed to be owning companies, and undertakes duty to set policies and procedures for them, it is then responsible for that duty. And we just haven't done any merits to— What's her best case on that point, that you can have her take and eat at school? Yes, Your Honor. That. So I would point the court to Dorden out of this court. Now, and that was under the Louisiana Workers' Compensation Act. But the court analyzed that a parent could be liable for alleged negligence if the parent was acting outside the normal scope of the shareholder's duties. I'd also direct this court to Johnson v. Abbey Engineering Co. That's also a Fifth Circuit case. There, the court affirmed a jury verdict, because the parent company undertook a duty to monitor safety at the subsidiary. The parent company inspected and reviewed a broad spectrum of safety policies and procedures, including the mechanism that caused the accident. And the pin site for that is 749 F. 2nd, 1131. The Seventh Circuit in Reboy—this case is cited in our brief—I think is very compelling, and similar to the claims that we're arguing here. There, the parent company, COSI—I think is how you say it—there were executives at COSI that testified in their deposition that they had responsibility to oversee safety at the yard where the accident happened. And so you have the same setup that we are alleging happened here, where a parent company or people at a parent company have decided to reach down and set or review policies and procedures at a subsidiary. And so those three cases, at minimum, support that if we can show the parent undertook an independent duty outside of its simple role of owning these subsidiaries and was negligent in that duty, we have a merits claim. Briefly turning, with the little time I have left, to the state law workers' comp tests. I think it's important that no matter what way the court looks at it, it ends up in the same place, that this decision below is the only decision where a district court has analyzed a parent's business by just assuming that the parent does all the business of its subsidiaries. So we cited state law workers' comp tests in our briefing. I also went and looked at the—this court in Fisher looked at the Longshore Harbor Workers' Compensation Act. Its history was that it was based on New York law. New York law follows the exact same alter ego test that we've articulated in our briefs. So if the court wanted to analyze the issue based on the history of the statute that the DBA extends, you get to the same place. And so there's really no—there is no case that treats parent companies and subsidiary companies as all in the same business for purposes of determining when a parent employs a subsidiary's employees. Finally, on the test under a combatant activities exception, I think it's important to note that we go through in our brief that the Badea test is closest to the court's reasoning in Boyle. In Boyle, this court in the N. Ray Katrina Breaches Canal litigation favorably cited the Second Circuit's N. Ray asbestos litigation case, and that's actually the Second Circuit's case where it first articulated the government made me do it test as what the Boyle test does. And so this court has previously in the Katrina Canal breaches case favorably cited the way that the Second Circuit has articulated Boyle, and the Badea decision is completely consistent with that. Unless the court has any other questions, I'll save my time for rebuttal. You have some time for rebuttal, Ms. White. Mr. Russell? Thank you, Your Honors. And may it please the court, my name is Dan Russell, and I'm here on behalf of KBR, Inc. This suit arises out of an extraordinary and, I would say, uniquely federal context that is an enemy nation's attack on a U.S. military base in Iraq while at the time the plaintiffs, the appellants, were supporting U.S. forces and acting as overseas contractors. As a result of those and other undisputed facts, the district court properly recognized that this case implicates uniquely federal interests and is barred under multiple federal doctrines. I don't understand how there's federal officer removal jurisdiction here. It seems to me that KBR itself was not being directed by any federal officer. Judge Smith, two answers to that. First of all, as we argued in the district court, as Judge Rosenthal accepted and was not appealed, the KBR entities acted as a team on this project and collectively were acting under the direction of a federal officer. Judge Rosenthal accepted that. Second, Judge Smith? Well, whether it was appealed or not, it's jurisdictional. We would look at whether the district court ever had jurisdiction in any event. I understand, Judge Smith. If this court does that, I would urge it not only to look at the federal officer removal statute, which we believe supports removal, but also an alternative grounds for removal that we asserted, which is pursuant to 28 U.S.C. 1441, removal is proper on the grounds of a federal question, and as the U.S. Supreme Court and this court has recognized, where a federal court ought to be able to hear claims that are under state law but turn on substantial questions of federal law. Let's return. I don't mean to interrupt you because you're being responsive, but we need to discuss this. To return to my question, how was KBR itself, talking only about KBR, Inc., how was it being directed by a federal officer? Judge Smith, my answer is that KBR, Inc., the corporate parent, was acting as part of a team, and as the plaintiffs recognized, among other things, it was setting policies that were followed and feared. We acknowledge that KBR, Inc., itself, was not on the ground in Iraq, but we believe as part of that team, it satisfied the standard under the federal officer removal statute. If this court disagrees, there's a separate grounds for removal, which is the federal question, and the fact that this suit implicates matters that are uniquely federal and that should be handled at the federal court level, including the Defense-Based Act and activities exception. So KBR didn't employ anybody there or direct the people who were employed by KBR? And, Judge Smith, I want to be careful how I answer that because employ has a specific meaning here under the DBA, but in the sense that the employment agreement was between two entities, the plaintiffs and SCII, which is a subsidiary, we acknowledge that KBR, Inc., was not the employer in that sense. However, the DBA has a broader test for employer and this court has recognized that multiple entities can be a DBA employer, so you must look beyond just the face of the employment agreement to determine whether or not the entities at issue here satisfy, as we believe, the oil field safety test. And I'm happy to turn to that, Your Honor, but I hope I've answered your question. I'll turn to the oil field safety test and I just want to reiterate that the presence of the DBA as a federal defense provides a separate and distinct basis for federal court jurisdiction and it provides that because this is an area where there is a need for uniformity at the federal level of substantial questions of federal law that implicate not only a federal statute, i.e., the DBA, but also it implicates important foreign policy concerns and the Fifth Circuit has consistently held that federal jurisdiction exists where state court claims raise substantial questions of common law that implicate important foreign policy concerns. For example, in the Torres case 113 F. 3rd, 540, which we cited in removing the matter, that principle was recognized. Here, we submit that a straightforward application of the Defense Base Act results in these claims being barred. As the district court held, the proper test this court has enunciated is the relative nature of the work test for determining whether KBR, Inc. is an employer for DBA purposes. We put forward undisputed evidence in the district court that KBR, Inc.'s regular business included the performance of support work for the military in Iraq. It is undisputed that the plaintiffs here were performing support work for the military in Iraq. We think it's a straightforward, not a close call, that we meet the oil field safety test. In addition, the plaintiffs have offered on appeal alternative tests. Let's talk about the alter ego test that your opponent cited, the Jordan and Reboy and some other cases, on the argument that basically if you're not an alter ego, then you can't claim the benefit of being the employer. How do you respond to that? Judge Haynes, we don't claim that we meet the alter ego test and we didn't do so in our briefs. However, the plaintiff's assertion is that either the alter ego test or the economic reality test should be applied in this setting. And it is our position that we easily meet the economic reality test, which in some ways No, but just to understand, your opponent argued in response to my questioning about having a cake and eating it too, those cases. So what's your response to that? Well, I guess in the first instance, your Honor, my response is that we are not asserting that KBRA is an alter ego here. We're asserting that we meet the DBA test either under the oil field safety test or under the economic reality test, which doesn't require us to be an alter ego. So you're saying those cases are irrelevant? Yes, your Honor. Okay. And so then tell me about the other test. So the economic reality test that the plaintiff's opponents have put forward focuses on the employee's perception of the reality of the employment relationship and whether the employee's work was essentially that of the defendant. And here, the plaintiff's clearly perceived, their perception was that they were working for KBR. Didn't two of the three actually write that somewhere? Yes, your Honor. Judge Haynes, in pursuing their federal remedy, their DBA remedy, at least two of the three have named KBR as their employer, reflecting their perception that KBR is their employer and satisfying the economic reality test that the opponents have put forward. So their employment forms, the files that we put forward and that were undisputed in the district court reflected a clear understanding on the part of these employees that they were doing work on behalf of KBR and as part of KBR's overall business. And so for many of the same reasons that we meet the oil field safety test, we also meet the economic reality test. And in either event, these claims are barred. And I should add, as they should be, to fulfill the design and purpose of the Defense Base Act. The very purpose of the Defense Base Act as recognized by this court in Fisher and other cases is to provide an exclusive remedy and to avoid a scenario in which employees are pursuing multiple forms of remedy relief for the same injuries. That was the congressional intent underlying the DBA. That would be undermined if the court allowed this loophole of allowing plaintiffs to pursue multiple remedies for the same injuries. I was looking back at your brief regarding your reference to the federal question jurisdiction and I'm noticing here your jurisdictional statement in your brief consists of two sentences. One, this court has appellate jurisdiction under 28 U.S.C. Section 1291. Second sentence, subject matter jurisdiction is lacking because plaintiff's claims are barred by the political question doctrine. That has to refer to subject matter jurisdiction in the district court and you say it's lacking but today you tell us that we have federal question jurisdiction. Which is it? Your Honor, the answer is that the case is removable but that the federal doctrine, the So there is a grounds to get out of state court into federal court on multiple grounds. But federal question jurisdiction is a subset of subject matter jurisdiction, right? Yes. But here you say subject matter jurisdiction is lacking. I don't understand that. I understand the apparent tension, Your Honor. Our position, again, is that the political question doctrine, maybe I should start with some fundamental points. This court has recognized that the political question doctrine is jurisdictional. It does go to whether or not the court has power to hear the case. So our position is both that there are grounds for removing the case to federal court because on the basis of the federal officer removal statute as well as the federal question grounds for removal, but our position is that in federal court the case cannot proceed because it would violate the political question doctrine. We also argue, of course, that VBA and the combatant activities exception separately are pursuing the claims. Well, and the political question is handled a little differently than if two Texas people sued each other for under $75,000 about a car wreck. It is handled as we defer to the politics and don't decide it as opposed to we could never decide this. We are lacking even the opportunity to decide whether to decide. Correct, Judge. Am I right? It's a little bit of a different place on this road that Judge Smith is asking you about, which is can you walk in the door or once you're in the door do we want to listen to you? Judge Hinge, I agree and I think that this court in Lane remarked that it is animated by prudential concerns as well as, you know, sort of other concerns. And that, to your point, it is more of a prudential doctrine that courts are not to hear certain kinds of disputes because it oversteps the boundaries of the separation of powers. Which is a little bit different from saying there's no diversity jurisdiction, no federal question, blah, blah, blah. I agree. And I think that, you know, it is a bit of an odd duck within the subject matter jurisdiction land. It has been decided by this court that it is a 12B1 issue, that it is jurisdictional, but it has also been remarked in Lane that it is a unique kind of subject matter jurisdiction that is more prudential in nature than something like diversity. Okay. All right. So, bottom line, were these employees needed at the time? Judge Hinge, the answer is they were needed. I don't know that that is a material question to any of our defenses. Under the DBA, whether they were needed or not, and I guess I'm not sure what that exactly means, but whether they were essential, whether they were— Well, I'm just thinking if the place was open but there's no food, that might be a bit of a problem for the people that are still there. If there's going to be a fire but there's no fire agent, then there's going to be a problem. I mean, so I guess I'm just wondering, you know, it's a little bit different from being in the Army itself and being the one with the weapon to go out and shoot someone, but you still need to eat even if you're the one with the weapon. Absolutely, Judge Hinge. The very concept of LOGCAP under which these individuals were working was to augment the troops and to provide essential functions that in prior wars, going back to Vietnam, for example, would have been performed by uniformed soldiers. So the tasks and the functions that are being performed by the plaintiffs in Iraq in prior wars would have been carried out by uniformed soldiers, and to your point, that they are essential to the mission. That's the point of LOGCAP, to provide essential support services for the Army, and that is reflected in the record. I think the plaintiffs are arguing that certain were essential and certain were not essential, but the record reflects that they were, as Judge Rosenthal clearly found. And I only point out, Judge Hinge, that as to the DBA issue and the preemption issue, I don't think at the end of the day that that's the material point. I think that we satisfy the Soleil test. We satisfy the U.S. government's preemption test, and that's not turning on a particular designation of the employees. I think that's clearly been satisfied. I do want to turn to, with court indulgence, the combatant activities issue, and as— Now, we don't have to reach it if we agree with you on DBA, right? Absolutely, Judge Hinge. Go ahead and address it. I just want to be clear on that. If the court agrees with us on DBA, it can affirm on DBA and doesn't need to go further. If the court agrees with us on political question doctrine, it can affirm on that and not go further. So it has multiple options for it. Go ahead. I just wanted to clarify that. And I'll just add to that, Judge Hinge, that if the court dismisses on the political question doctrine, there is precedent for it to continue—it could choose to proceed, as it did in Spectrum Stores, where the court dismissed on a jurisdictional political question doctrine basis and proceeded to also dismiss on the active state doctrine, finding that the facts that supported dismissal under the political question doctrine also supported dismissal under the active state doctrine. Here, we believe the combatant activities exception preemption defense provides a separate alternative grounds for dismissal. And it's not only a reason why the case should be in federal court. It's a reason why the federal court should hold that these types of claims undermine uniquely federal interests. And this court has before it a couple of options if it does address the combatant activities issue in terms of which test it would like to use. There have been three in the briefing. I mean, the court could, in theory, craft its own. But the three that have been addressed in briefing are the Soleil test, which Judge Rosenthal relied upon, the United States' test, which we offer as a better formulation. We think the Soleil test is a good test, and it could be affirmed. But we think the United States, which enunciated its test after Soleil, did a better job in formulating the preemption rule. And then the third is the Bodea test that the plaintiffs rely on. I want to be clear. Under the facts here, we meet all three tests. However, we think the Soleil or the United States government's test are the better formulations and are most consistent with, one, the Supreme Court's decision in Boyle, and two, the precedent of this court. First of all, under the Soleil test as applied by the district court, the Soleil test looks at two factors. One is whether or not the entities were integrated with the military's combatant activities, and the second is whether they were subject to ultimate command authority. And the record here establishes both the integration factor and the command authority factor. And what it shows is, one, the military, and this is not disputed, had the ultimate, not only the authority, but also the responsibility to provide force protection for these individuals inside of a war theater, and two, the military had the ultimate authority over any evacuation decision. On the night of this attack, in the hours preceding it, the military gave directives to KBR personnel on the ground, and they followed those directives. They included bunkering down, staying in their bunkers through the night, and then... So they were told to stay? Absolutely, Judge Haynes. But the court said they weren't told to stay. You're absolutely right. There was a direction given, and the direction was bunker down. You must bunker down. Because running away can also have its problems, right? Absolutely. Running away could cause all sorts of problems. One, there's a safety issue. This is not a safe place to run off into the desert. That's an obvious one. And in addition, this was at a moment where the United States was faced with a potential international crisis. U.S. intelligence, which KBR was not privy to, was intercepting, had information that Iran was targeting certain bases, and at the same time, the U.S. was trying to portray strength. And if suddenly a thousand contractors fled this base, it would have caused havoc and chaos in the midst of this war effort. It's one of the reasons why infusing state tort law into this scenario would unsettle the military's ability to control its operations inside of a war zone. So I do think, you know, getting back to the Salay test, that ultimate command authority was clearly there, and shifting very quickly, because I see my time is almost up, you know, for the United States' test, you know, if the court looks at that issue, I would urge it to read the Solicitor General's brief. Judge Jones wrote a very eloquent opinion in her dissent to the denial of rehearing en banc in the McManoway case, joined by several members of this panel, which set forth the parameters, and we would say the proper parameters, of a combatant activities exception preemption rule, and under that rule, there's no reason in the language of the statute to distinguish as between claims against contractors in the United States. These claims, if any claims, arise out of combatant activities. These claims arise out of combatant activities. Allowing state tort law to invade this province would severely undermine military operations. Thank you. Thank you, Mr. Russell. Ms. White, you save some time for rebuttal. Thank you, Your Honors. A few points in rebuttal, and I'll start with the discussion towards the end of my opponent's argument. What we are saying is that the military did not tell the KBR team on the ground to stay put in the days leading up to the missile attack, when things were escalating. We are not saying that KBR and the military failed to properly act during the missile attack or in the hours leading up to it, but there was a period of days, January, at least January 4th through January 7th, where KBR could have asked the military about doing something and did not. And to my opponent's point about there being all of this sort of decision making about people leaving the base, people not leaving the base, we are not saying that if the military had said, no, you all have to stay, that there would be an issue. There wouldn't. That's exactly what the Boyle defense is designed to protect against. But I would note for the court that KBR put into the record newspaper articles that it says are hearsay and it's not relying on for the truth of the matter, but in those news articles, the military is talking about the fact that it sent soldiers out into the desert to be in relative safety. And so there was more going on, according to KBR, than just you're stuck in the base or you can't go anywhere. We don't know what KBR knew or why KBR wasn't doing anything. We haven't gotten to that part of the case yet, but what they have put into the record. Why should Texas law cover the Iraq war zone? Texas law should not cover what the military did in Iraq, but there's no reason Texas law shouldn't cover what KBR, a Texas company, the policies and procedures it has for its employees. In the middle of a war zone in Iraq. Yes, Your Honor. And the reason I'm saying that. I mean, I respect Texas, but that's going, that's a distance. The reason I'm saying that, though, is that these particular employees, and this gets to Your Honor's question about whether they are needed. These, like Ms. Andrade is a good example. She is cleaning a cafeteria. The record evidence does not prove as a matter of law she was essential. The only record evidence is the opposite. Because in real time, the only essential dining personnel, according to KBR's documents, was the Havoc dining facility employees. And there's no evidence that she was one of them. And the problem with KBR's argument that anyone working for them is covered by the combatant activities exception is that that reasoning gives the contractor full immunity. So part of the log cap contract includes sewing, laundry, moral welfare, entertainment, recreation. Those people are not performing duties that are integral to combatant activities. And so there really has to be an analysis of what are these particular people doing. Otherwise, the court runs the problem of creating the contractor immunity that the FTCA clearly doesn't contemplate. On the economic reality test that my opponent raised, the test looks at the objective criteria of the employment relationship. Who paid the person? Who hired them? Who could fire them? Who gave them instructions? The record evidence is that KBR Inc. did none of those things. The only thing that KBR is pointing to is the fact that two of my clients wrote KBR on a form that they submitted for workers' comp. It's not surprising they did this. They are not experts on KBR's corporate structure. And the evidence that KBR put in their record, the emails from people down on the ground at the time this was happening, shows that all of them were just referred to as KBR. So from my client's perspective, the people they were interacting with on the ground, they could not tell who worked for what entity. The email addresses and the email signature lines all just say KBR. And I doubt that KBR would be willing to agree on the flip side when they're trying to avoid an employment relationship that the fact that someone writes on a form KBR means that all other things put aside, it has become the employer. So what should they have written on the form? One of them wrote KBR services. Two wrote KBR. What they should have written on the form is SEII because that's the company that paid them. If they had been consulting a lawyer, for example, who had helped them fill out the form in a more careful way, but this is something they were filling out on their own. And so from what they were seeing down on the ground, if everyone's just wearing KBR gear and the employees all say KBR, that really goes to what KBR has been doing this whole time, which is saying it's not an alter ego while acting like it is one in order to get into federal court and try to invoke these defenses. This court should reverse. Thank you. So tell us in one or two sentences, you just said we should reverse, but tell us in one or two sentences how we would express our statement of reversal if we were to agree with you. If this court agrees that KBR and all its subsidiaries have to be distinct as a matter of law, I think this court could reverse on subject matter jurisdiction and send this back to state court. If the court agrees that that's a tolerable argument but that it's not meritorious, I think this court needs to reverse to the district court and remand for further proceedings. All right. Thank you, Ms. White. Your case and both of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow.